**MARJORIE WEBSTER JUNIOR COL-
LEGE, INC., Plaintiff,**

v.

**MIDDLE STATES ASSOCIATION OF
COLLEGES AND SECONDARY
SCHOOLS, INC., Defendant.**

Civ. A. No. 1515–66.

United States District Court
District of Columbia.

July 23, 1969.

**460**

C. William Tayler, Edwin R. Schneider, Jr., Washington, D.C., for plaintiff.

Charles S. Rhyne, Courts Oulahan, Benjamin P. Lamberton, III, Robert H. Culp, Rhyne & Rhyne, Washington, D.C., for defendant.

## OPINION

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiff, Marjorie Webster Junior College, Inc., brings this action under the antitrust laws of the United States and specifically under the provisions of Section 3 of the Sherman Anti-trust Act [1] and Section 16 of the Clayton Act.[2] Jurisdiction is invoked under the provisions of 28 U.S.C. § 1337 vesting original jurisdiction of actions involving the antitrust laws in the district courts of the United States and under Section 11–521 of the D.C.Code (1967 ed.). A second count seeks relief under the Constitution and the common law controlling the activities of private associations.

The case arises out of plaintiff's desire to obtain regional accreditation for the institution it operates in the District of Columbia. Defendant has refused to evaluate the merits of plaintiff's educational program for accreditation, basing its refusal upon defendant's rule of eligibility which provides that to be considered for evaluation for accreditation an institution must be a nonprofit organization with a governing board representing the public interest.

Marjorie Webster Junior College (herein Webster) is a proprietary corporation organized in 1927 for educational purposes under the District of Columbia law (D.C.Code § 29–601, 1967 ed.). All of the stock is held by members of the Webster family. Since incorporation it has operated in the District of Columbia as a junior college for women with courses in seven departments, including a department of Liberal Arts. It offers both terminal and transfer courses. Most students who take terminal courses seek no additional formal education after graduation. The transfer courses, however, are designed for students who desire to continue their education by transferring with credits earned at Webster to other institutions offering four year courses. Plaintiff was accredited by the District of Columbia Board of Education pursuant to D. C.Code § 31–120 (1967 ed.) in 1947 and has awarded the degree of Associate in Arts to approximately 2,300 graduates

---

1. 15 U.S.C. § 3.

2. 15 U.S.C. § 26.

who have satisfactorily completed the prescribed course of study.

Middle States Association of Colleges and Secondary Schools, Inc. (herein Middle States) is a nonprofit educational corporation chartered under the laws of the State of New York on May 27, 1966 for the improvement and development of educational institutions, relationships and services. Its predecessor was Middle States Association of Colleges and Secondary Schools, an unincorporated nonprofit association established in 1887. Defendant conducts a program of evaluation and accreditation of institutions of higher and secondary education located in New York, New Jersey, Pennsylvania, Delaware, Maryland, the District of Columbia, Puerto Rico, the Canal Zone and the Virgin Islands. Middle States, one of six nationally recognized regional accrediting associations, prepares and maintains a list of accredited institutions of higher education which is published and given national distribution by the American Council on Education.

Accreditation is the process whereby an association or agency recognizes an institution as having met certain predetermined standards. The process as employed by defendant involves establishment of standards of quality and identification of those institutions which have achieved them. It seeks to determine in broad qualitative terms whether an institution has clearly defined and appropriate objectives, whether it has established conditions under which it can reasonably be expected to attain them and whether it appears to be attaining them and may be able to continue to do so. The process involves self-evaluation by the institution, evaluation by a visiting team drawn from Middle States' membership, and action upon the report of that team by the Commission on Institutions of Higher Education. Institutions identified as meeting and maintaining announced standards appropriate to the educational activities in which they are engaged are accredited. Membership in Middle States is concomitant with accreditation by the Commission on Institutions of Higher Education or the Commission on Secondary Schools.

Defendant's membership includes 346 nonprofit institutions of higher education (universities, colleges, junior colleges and specialized institutions). Approximately 106 of these institutions are state or municipal universities, colleges or junior colleges; 83 are private nonsectarian institutions, 137 are private church related or controlled universities, seminaries or junior colleges, 15 are specialized institutions with concentrated courses of instruction in music, optometry, pharmacy and textiles, one is a special private institution for the deaf, three are federally sponsored military academies and one is a federally sponsored junior college. The membership also includes certain institutions outside the United States assigned to Middle States by agreement among the regional associations.

In 1964 the Commission on Institutions of Higher Education of Middle States, the Commission on Institutions of Higher Education of the New England Association of Colleges and Secondary Schools, Inc., the Commission on Colleges and Universities of the North Central Association of Colleges and Secondary Schools, Inc., the Commission on Higher Schools of the Northwest Association of Secondary and Higher Schools, the Commission on Colleges of the Southern Association of Colleges and Schools, Inc., and the Accrediting Commission for Senior Colleges and Universities and the Accrediting Commission for Junior Colleges of the Western Association of Schools and Colleges established the Federation of Regional Accrediting Commissions of Higher Education (herein the Federation) to represent the six accrediting agencies in matters of common interest, to establish policies and procedures, and to exchange information, experience, and personnel. At its initial meeting in March 1964 the Federation issued a policy statement on eligibility for accreditation. One of the six eligibility criteria was the require-

ment that "The institution should be a nonprofit organization with a governing board representing the public interest."

Plaintiff contends that defendant and its members have formed a combination or conspiracy in restraint of the plaintiff's trade in the District of Columbia in violation of Section 3 of the Sherman Act. It alleges that this combination or conspiracy results from the combining of the members into an association which has acquired monopoly power over regional accreditation in this area and is unreasonably exercising this power in such manner as to prevent or inhibit competition from proprietary institutions. Plaintiff claims that many accredited senior colleges and universities have rejected and will continue to reject transfer applications and credits from Webster graduates and that it is handicapped in its recruitment of high school graduates because of its lack of Middle States accreditation. Plaintiff contends that it fulfills all the criteria for accreditation and membership except the nonprofit requirement and that defendant's exclusionary policy is unreasonable per se.

The second count in the amended complaint alleges that the accrediting function as practiced by defendant is so inherently governmental in nature that its actions are state actions in a constitutional sense subject to the restraint of due process and that the defendant has acted in an arbitrary, discriminatory and unreasonable manner in rejecting plaintiff's application. Plaintiff alleges that membership in the defendant association is necessary if Webster is to continue successfully as an institution of higher education. It contends that defendant's power is subject to judicial control and must be exercised in a reasonable fashion so that a licensed institution may function to serve the public interest in education.

Webster seeks a permanent injunction enjoining defendant, its officers, trustees, agents, and employees and all persons and organizations acting in concert with it from denying plaintiff eligibility for evaluation and accreditation solely because of its proprietary character and ordering Middle States to accept plaintiff's application for evaluation and to accredit plaintiff if it otherwise qualifies under defendant's standards. Webster also seeks a decree of the court declaring illegal, null and void defendant's requirement that institutions of higher education be "nonprofit organizations with a governing board representing the public interest" to be eligible for evaluation and accreditation by defendant.

Defendant, inter alia, contends that higher education is not trade or commerce within the regulatory ambit of the Sherman Antitrust Act. Middle States avers that its policy with regard to proprietary institutions is in no way motivated by the desire to protect its members from economic competition from such institutions and that no combination or conspiracy in restraint of trade exists. It denies that it has conspired to eliminate or suppress the competition of proprietary institutions. Defendant admits that accreditation by it is of importance to institutions of higher education but denies that its accreditation is essential to continuing a successful operation of such an institution. If the Sherman Act is applicable, Middle States contends that its actions have been entirely reasonable and completely within the public interest.

With reference to count two, defendant asserts that it is a voluntary membership organization which has the right to set up its own membership criteria. It claims that it was not organized at the request or under the aegis of any governmental agency. Middle States denies that it is exercising a function ordinarily exercised by a government authority in the United States. Even assuming Middle States to be a quasi-governmental agency, defendant avers that its refusal to consider Webster's application for membership is not arbitrary and unreasonable justifying judicial intervention. Middle States further contends that plaintiff has sustained no le-

gally cognizable damage and has no standing to bring this action.

A threshold question exists in this proceeding with respect to venue. In addition to challenging the applicability of the Sherman Act, defendant denies that it "may be found or transacts business" in the District of Columbia. The following provisions of the Clayton Act are pertinent:

§ 12. Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

§ 16. Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18 and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rule governing such proceedings, * * *

At the time of the institution of this suit in June 1966, 28 secondary schools in the District of Columbia were accredited by the Secondary Commission of Middle States and two were candidates for such accreditation. Fifteen institutions of higher education were accredited by the Commission on Higher Education, while two such institutions held "correspondent status." During the period January 1, 1964 to October 16, 1966, 13 secondary schools in the District of Columbia were visited by committees of the Commission on Secondary Schools of Middle States in connection with evaluation for accreditation or review of accreditation. Each visit lasted approximately three days and was preceded by a visit by the Chairman. One of the committees was under the chairmanship of the then Executive Secretary of the defendant's Commission on Secondary Schools. In addition to these visits, the Chairman and Executive Secretary visited the District of Columbia on four occasions between February and May, 1966. Defendant also distributed publications to member schools including "The Selection of a Secondary School", "Middle States Accreditation General Information," and a newsletter to all member institutions in the District of Columbia.

The Executive Secretary of the Commission on Institutions of Higher Education visited the District of Columbia in connection with the evaluation of institutions for accreditation on ten occasions during the period 1965–1966. Middle States collected dues from its member institutions in the District of Columbia and estimated that its total mail volume to the District of Columbia was 450 pieces annually. It also estimated that staff members placed approximately 275 telephone calls to the District of Columbia between January 1, 1964 and October 15, 1966. The President of Middle States at the time this suit was filed was headmaster of the St. Albans National Cathedral School for Boys in the District of Columbia. During 1966 he attended and arranged meetings of Middle States officers and corresponded and communicated by telephone with the officers and other persons in connection with defendant's affairs. A meeting attended by five of the Middle States officers and the Administrative Secretary was held at St. Albans School in February 1966.

■ To support the claim that Middle States transacts business in this jurisdiction, plaintiff relies on Levin v. Joint Commission on Accreditation of Hospitals, 122 U.S.App.D.C. 383, 354 F.2d 515 (1965), involving an analogous situation. In *Levin* field inspectors of an Illinois hospital accreditation corporation came to the District to conduct inspections for purposes of accreditation. Although noting that the inspec-

tion visits accounted for less than one percent of the Joint Commission's activities, the Court held:

> The business of the Joint Commission is that of accrediting hospitals. Field inspections are an essential aspect of that business. When a field inspector comes to the District of Columbia to inspect a hospital, the Commission is transacting its business there as certainly as when the inspector's report is reviewed and acted upon in Chicago * * * when the Commission's field inspectors come here to perform the inspections without which the Commission's work cannot go forward, we think the Commission can be said to be transacting its business here to such a degree as to make it answerable here to claims of antitrust violation.[3]

The facts in the two cases are strikingly similar. It is evident that Middle States' contacts with the District of Columbia are sufficient in nature and degree to permit suit under Section 12 of the Clayton Act (15 U.S.C. § 22).

Jurisdiction and venue for count two are premised on the provisions of 28 U.S.C. § 1391; D.C.Code § 11–521 (1967 ed.); and jurisdiction pendent to the court's jurisdiction of the antitrust action set forth in count one. Jurisdiction under 28 U.S.C. § 1391(c) depends upon whether a corporation is "doing business" and D.C.Code 11–521(a) (1) requires that the party be "found" within the District. In Friedman v. United States Trunk Company, 204 F.Supp. 366 (S.D.N.Y.1962), the Court found no difference between "transacts business" as used in 15 U.S.C. § 22 and "doing business" in 28 U.S.C. § 1391(c), and United States v. Scophony Corporation of America, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), equated the concept "found" with the words "transacts business." See also Kelberine v. Societe Internationale, etc., 124 U.S.App.D.C. 257, 363 F.2d 989 (1966); Washington v.

Hospital Service Plan of New Jersey, 120 U.S.App.D.C. 211, 345 F.2d 105 (1965); Bilbrey v. Chicago Daily News, 57 F.Supp. 579 (D.C.D.C.1944); and Stevens v. American Service Mutual Insurance Company, D.C.App., 234 A.2d 305 (1967).

 The test of jurisdiction and venue is whether a corporation has made its presence felt in a particular area to advance its essential business purposes. Although it maintains no Washington office, the extent of its activities here clearly indicates that Middle States can be "found" and is "doing business" in the District of Columbia as contemplated by the statutes.

Since jurisdiction and venue have been established, it is unnecessary to consider Webster's additional reliance on the doctrine of pendent jurisdiction for count two. However, the unanimous opinion of the Supreme Court in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), lends support to plaintiff's view:

> Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority * * *,' U. S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding,

---

3. See also Semel Associates, Inc. v. United Fireworks Mfg. Co., Inc., 122 U.S.App.D.C. 402, 355 F.2d 827 (1965).

then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

Both counts of the amended complaint in the instant case allege the identical injury and request the same relief. Common questions of law and fact are involved which can be tried more expeditiously in one judicial proceeding.

A new and pivotal question here for determination is the applicability of the antitrust laws to the field of education. Is higher education, including the accreditation of institutions, trade or commerce and thus within the regulatory scope of the Sherman Act? Defendant contends that the legislative history of the Act demonstrates that it was intended to apply to the commercial world and not to the professions. Middle States emphasizes that the law was designed to break up the large trusts formed after the Civil War and to promote competition. Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 49–62, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); and Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Denying that it is engaged in commercial activities, defendant cites the traditional definition of "trade" contained in The Schooner Nymph, 1 Sumn. 516, 18 Fed. Cas. 506, No. 10,388 (1834):

> Whenever any occupation, employment, or business is carried on for the purpose of profit, or gain, or livelihood not in the liberal arts or in the learned professions, it is constantly called a trade.

Middle States asserts that "trade" has never been interpreted by the courts to extend to non-commercial activities such as the learned professions into which category it should be placed.

In the first American Medical Association (herein AMA) decision, United States v. American Medical Association et al., 72 U.S.App.D.C. 12, 110 F.2d 703 (1940), the United States Court of Appeals for the District of Columbia comprehensively reviewed the genesis and legal development of the word "trade" and held that the term as used in the Sherman Act included the medical profession. Chief Judge Groner concluded that the effect of all the English and American cases was "to enlarge the common acceptation of the word 'trade' when embraced in the phrase 'restraint of trade' to cover all occupations in which men are engaged for a livelihood."

In the second AMA case, American Medical Association v. United States, 76 U.S.App.D.C. 70, 130 F.2d 233 (1942), the Court of Appeals again included the medical field in the meaning of the word "trade" in the antitrust context. The Court held that Group Health Association, the organization which had been the victim of the AMA restraints, was clearly engaged in trade or commerce even though it was a nonprofit organization. It also found that hospitals in the District of Columbia—some charitable, some nonprofit, some proprietary—were engaged in trade and commerce within the meaning of the Sherman Act. (76 U.S.App.D.C. at 74–75, 130 F.2d 233). The Court said at p. 74, 130 F.2d at p. 237, "It is not necessary, in order to constitute trade or business, that it shall be carried on for profit," citing Hazen v. National Rifle Ass'n., 69 App.D.C. 339, 345, 101 F.2d 432, 438 (1938).

The myriad financial considerations involved in building programs, teachers' salaries, tuitions and miscellaneous operating expenses attest to the commercialization which necessarily exists in the field of higher education. Despite the opposition of many educators, there has been a recent trend toward the organization of faculty members to bargain collectively for better salaries and other benefits. Many institutions rent dormitory rooms and operate dining halls, book stores and other service facilities. Also there is a commercial aspect to the sharp competition for government and private contracts and the quest for research grants. In 1967–68 institutions

of higher education expended more than 17 billion dollars. The projection for the year 1976–77 is 41 billion.[4] Higher education in America today possesses many of the attributes of business. To hold otherwise would ignore the obvious and challenge reality.

■ Webster rightly contends that attention should be focused on its activities rather than the defendant's because the question is not whether the defendant association is engaged in trade but whether plaintiff's trade has been restrained. The Supreme Court held in the third AMA case that when the organization at which the restraint is directed is in trade, it is immaterial whether the offending association is so engaged. American Medical Association v. United States, 317 U.S. 519, 528, 529, 63 S.Ct. 326, 87 L.Ed. 434 (1943). Webster is a corporation engaged in business for profit. Its corporate activity consists of offering educational facilities and services in exchange for the tuition charged students. The income received is spent for faculty salaries, maintenance of buildings, equipment and grounds, and board for students. Webster pays all taxes, such as income, property, sales and payroll, customarily paid by business corporations. Middle States can hardly deny that plaintiff is engaged in trade since the plaintiff's proprietary character is the reason for the membership exclusion and the *sine qua non* of this proceeding.

The specific section of the Sherman Act upon which count one is based provides:

> Every contract, combination in form or trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal. * * * (15 U.S.C. § 3)

Plaintiff does not contend that the members of Middle States conspired specifically to restrain its trade nor that the six regional associations formed the Federation for that purpose. The evidence negates the existence of any evil, purposeful plotting by the defendant and Webster concedes that the reason for combining was honorable and laudable. However, it is clearly apparent that the intent to combine was present in each case and that the two associations, by their very formation, represent combinations and did enter into contracts.

■ A combination which imposes unreasonable restraints on the trade of others is actionable under the Act. An intent to restrain trade is not an essential element of the proof. The burden is met if it is shown that the consequences flowing from the activity complained of amounted to a restraint of trade. In United States v. Griffith et al., 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), the Court stated:

> It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the anti-trust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements.

See also, United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913); United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); and United States v. Columbia Steel Company, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). Moreover, a laudatory purpose or intent will not excuse violations of the laws. "Neither the fact that the conspiracy may be intended to promote the public welfare, or that of the industry * * * is sufficient to void the penal-

4. Quality and equality: new levels of federal responsibility for higher education, Carnegie Commission on Higher Education, December, 1968.

ties of the Sherman Act." American Medical Association v. United States, 76 U.S.App.D.C. 70, 73, 130 F.2d 233 (1942). Also, it is not necessary that the restraint result in total exclusion from the market. A violation of the antitrust laws exists if the combining results in a special advantage to members of an association over non-members or deprives the non-member of a significant business service. Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

 Certain practices, such as price fixing, are conclusively presumed to be unreasonable and therefore illegal per se because of their harmful effect on competition and lack of any redeeming virtue. Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The combination or contract involved in the instant case is not so devoid of potential benefit or so inherently harmful as to fall into the above category without proof that it actually had the effect of restraining trade. In the absence of a per se violation, proof is essential that the agreement resulted in an unreasonable restraint of trade. Although there is no single test to determine unreasonableness, Mr. Justice Brandeis established the following guidelines in Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683 (1918):

> But the legality of an agreement or regulation cannot be determined by so simple a test as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts pe-

culiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

Both Middle States and the Federation have adopted policies which provide that to be eligible for accreditation an institution must be a nonprofit organization with a governing board representing the public interest. Since Webster is a proprietary institution, defendant has refused to even consider its qualifications for accreditation. In view of the fact that Middle States is the only accrediting agency oriented in purpose and scope to Webster's accrediting needs, this refusal assumes additional importance.

Applying the standards discussed by Mr. Justice Brandeis in Board of Trade of the City of Chicago v. United States, supra, the exclusionary criterion must be viewed in the light of defendant's objectives. In other words, does the criterion serve to further, or is it reasonably related to, the stated purpose of the association? Middle States' corporate charter sets forth that the purpose of the association, inter alia, is "* * * to encourage the achievement of higher quality * * * among the higher institutions, secondary schools and other educational agencies in the Middle States." The objectives are concisely set forth in a document published by the Middle States Higher Commission, Middle States Membership and Initial Accreditation, as follows:

> The Middle States Association is an independent membership organization. It admits institutions of higher education to membership through a process of evaluation and accreditation which has a double purpose. One is to serve the education world and the public by establishing standards of quality and identifying institutions which achieve

them. The other, equally important, is to stimulate and help institutions reach their maximum effectiveness.

In support of the exclusionary criterion, defendant argues that a proprietary institution is interested in profits and that failure to devote total resources to education will result in an inferior program. The profit motive, Middle States contends, threatens the integrity of the proprietary institution by diverting it from the basic responsibilities of an educational institution. Educational excellence is determined not by the method of financing but by the quality of the program. Middle States' position, moreover, ignores the alternative possibility that the profit motive might result in a more efficient use of resources, producing a better product at a lower price. Additionally, an efficiently operated proprietary institution could furnish an excellent educational curriculum whereas a badly managed nonprofit corporation might fail. Defendant's assumption that the profit motive is inconsistent with quality is not supported by the evidence and is unwarranted. There is nothing inherently evil in making a profit and nothing commendable in operating at a loss. Furthermore, defendant's position in this regard is weakened by the fact that the Western Association of Schools and Colleges (one of the six regionals) lists three proprietary institutions of higher education in its membership and Middle States itself accredits three proprietary secondary schools.

Webster complains that the lack of regional accreditation stigmatizes the school as being of inferior quality and thereby discourages prospective applicants. It contends that the defendant has acquired monopoly power over the regional accreditation of higher education in the Middle States area. Convincing evidence was adduced that lack of accreditation reflects adversely on the value of credits earned and inhibits the transferability of these credits when Webster graduates seek advanced standing at four year institutions. Testimo-

ny was presented indicating that college admission officers place heavy reliance upon the judgments of regional accrediting associations when considering student applications. Likewise, certain college directories and guides do not list Webster because of its non-accredited status, and high school counsellors are hesitant to recommend an unaccredited school because of the difficulties encountered. A survey conducted by Middle States among its membership indicates that 75% of the member institutions impose certain conditions or limitations upon students transferring from non-member schools. The evidence is also undisputed that, with the increased interest in higher education and the mobility of our society, the regional accrediting associations have grown in importance and prestige. Since the public relies heavily on the judgment of these associations, educational institutions of all types should be evaluated.

Some of the benefits which accrue to institutions of higher learning, the public and students as a result of accreditation are described in the September 1968 edition of Accredited Institutions of Higher Education published by the Federation:

> Accreditation also helps facilitate the evaluation of students' credits for admission or transfer to other institutions. An institution's accreditation warrants the consideration of its academic records at face value when these records are accompanied by clear statements of the institution's aims for the program taken. The acceptability of a record for transfer or other purposes depends, of course, upon the appropriateness of the program followed and the quality of a student's performance in it. But when an institution lacks accreditation, it is obliged to establish some other basis for confidence in its work, and its students' records should be appraised individually.

In view of the foregoing, it is obvious that membership in Middle States results in a special advantage to

members of the association over non-members and deprives the non-member of a significant business service. Accreditation is necessary to engage in effective competition in the field of higher education today. The court finds that the exclusionary criterion does inhibit Webster's ability to compete in the field of higher education and does not further the stated objectives of the associations. Such a discriminatory exclusion without evidence to justify it must be found arbitrary and unreasonable. Since the criterion is arbitrary and unreasonable, Webster is entitled to relief.

Much of the evidence adduced in connection with the first count of the complaint applies also to count two. As previously indicated, identical injury is alleged and the relief requested is the same. Plaintiff contends that although the Constitution of the United States normally limits only action by the government, a private association performing a state function or exercising delegated powers of a governmental nature becomes subject to the restraints of the Constitution, including the due process clause. Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L. Ed. 265 (1946). Plaintiff further insists that when a private organization becomes so powerful that membership in that association is an economic necessity, the power must be exercised in a reasonable manner. Falcone v. Middlesex County Medical Society, 34 N.J. 582, 170 A.2d 791, 89 A.L.R.2d 952 (1961); Group Health Cooperative of Puget Sound v. King County Medical Society, 39 Wash.2d 586, 237 P.2d 737 (1951); Higgins v. American Society of Clinical Pathologists, 51 N.J. 191, 238 A.2d 665 (1968). Defendant, on the other hand, denies that membership is an economic necessity and that its refusal to make an exception to its rules for plaintiff is arbitrary and unreasonable. Middle States further denies that its activities are of a quasi-governmental nature and

contends that the internal administration of a private association is beyond the reach of judicial review. North Dakota v. North Central Association of Colleges and Secondary Schools, 99 F.2d 697 (7 Cir. 1938); Parsons College v. North Central Association of Colleges and Secondary Schools, 271 F.Supp. 65 (N.D.Ill.1967); Green v. Obergfell, 73 U.S.App.D.C. 298, 121 F.2d 46, 138 A.L. R. 258 (1941); Fish v. Huddell, 60 App.D.C. 263, 51 F.2d 319 (1931); Avin v. Verta, 106 A.2d 145 (D.C.App.1954).

█ As a general rule, courts adhere to a policy of noninterference with the internal affairs of private voluntary associations. Membership in such a group is considered a privilege and not a right. However, there is an exception when the association enjoys monopoly power in an area of vital public concern. If the power, because of public reliance upon it, is great enough to make membership a necessity for successful operation, judicial intervention may be justified.

In *Falcone* a county medical society had excluded a duly licensed and registered physician in the State of New Jersey from membership by applying a policy which required four years attendance at an approved medical school. Since hospitals in the area required that a doctor be a member of the society in order to use their facilities, the refusal to admit him had serious adverse effects on the doctor's economic and professional status. In directing the society to admit him to membership, the court recognized the reluctance of courts to interfere with the internal affairs of membership associations, but noted that judicial scrutiny and relief were granted when necessary in cases of expulsion. Turning to the special problem of exclusion, the Court said:

We are here concerned with * * * an organization, membership in which may * * * be viewed as 'an economic necessity'; in dealing with such an organization, the court must be particularly alert to the need for truly

protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity for earning a livelihood while not impairing the proper standards and objectives of the organization.

See also: Hurwitz v. Directors Guild of America, 364 F.2d 67 (2 Cir. 1966).

■ Evidence has been presented that accreditation by Middle States is necessary for plaintiff to continue operating successfully as a junior college. Prominent educators appearing as witnesses in this proceeding expressed divergent views. However, some who are members of the defendant association testified that regional accreditation is more important today than ever before and that lack of it would be harmful to any institution. Accreditation has become the symbol of academic acceptability, and many states measure the educational excellence of their public institutions by the standards of the regional associations. Furthermore, defendant acts in a quasi-governmental capacity by virtue of its role in the distribution of Federal funds under the "aid to education statutes." Selection of the recipient schools is frequently dependent upon the accredited status of the applicant. Middle States and the other regionals are officially recognized by the United States Commissioner of Education who publishes a list of nationally recognized accrediting agencies and associations which he determines to be reliable authority as to the quality of training offered by an educational institution. 38 U.S.C. § 1653(a).

In addition, the evidence discloses an arrangement between the United States Office of Education and the regional associations relative to the eligibility of institutions which are candidates for but have yet to achieve final accreditation. In 1967 Middle States' practice of attesting to the quality of these institutions through "letters of reasonable assurance" of accreditation was discontinued when the Office of Education agreed to accept in lieu thereof "Correspondent Status" listing as evidence of eligibility for assistance. Mr. John Proffitt, Director of the Accreditation and Institutional Eligibility Staff of the Office of Education testified: "Accreditation has become, fundamentally speaking, a service aspect to the Federal Government in determining eligibility for funding. This has arisen as a result of the language written into Federal funding assistance legislation by Congress."

Over the years Middle States has achieved a position of great influence in American education. It has elevated the quality of education and has become a powerful instrumentality which sets policies in an area of vital concern to the public. Accreditation has been established in the public mind as a mark of distinction and quality. It confers a significant competitive advantage on defendant's members as distinguished from non-members. In view of the great reliance placed on accreditation by the public and the government, these associations must assume responsibility not only to their membership but also to society. There is need for the application of sound standards in the evaluation of all schools and for increased coordination and understanding throughout the educational world. The regional accrediting associations and the Federation have an opportunity to provide new leadership in orienting their policies toward the broader welfare of society and the public interest.

A crisis exists in higher education today. There is tension, turmoil and unrest on the American campus. Students dissatisfied with established routines and unquestioned goals, are demanding reform. In addition, institutions of higher education are experiencing severe economic pressures, and new methods must be found to meet the challenge. It has become increasingly apparent that the demands of the educational deficit cannot be met exclusively by foundation, state and federal financing. In this connection an excerpt from an editorial written by the President of the Univer-

sity of Oklahoma, Dr. J. Herbert Hollomon, when he was Assistant Secretary of Commerce for Science and Technology, warrants quotation:

> Every year I visit 25 to 50 business firms and 25 to 50 colleges and the contrast in being "business-like" is striking. We would not let a company gain a monopoly and become so entrenched that its services declined. Why should this happen in our educational system? We need the competition of business in education which is now in the domain of city, county, and state government. Getting business more heavily into the educational field is the best way to guarantee competitiveness and innovation and insure against monopolistic control and exploitation.[5]

With a rapidly expanding population, broad social changes, and the complexities of modern life, higher education in the United States is a matter of national concern. A sound educational system is essential to our pluralistic society. This can best be attained by private nonprofit, proprietary, and public institutions working together toward a common goal —the improvement of higher education.

Webster seeks merely to be given a chance to qualify, but Middle States refuses even to consider its application for academic recognition. This action is arbitrary, discriminatory and unreasonable. The American system of free enterprise is structured on fair and open competition—not monopoly. The national interest is not best served by stifling competition from any available source. With the unprecedented demands upon educational resources in this country, every institution should be given the opportunity to demonstrate its worth. Defendant should accord to non-members an equal opportunity for evaluation at a reasonable cost and on conditions no more onerous than those for members. While precedent in this field is limited, fundamental fairness dictates that plaintiff is also entitled to prevail on count two.

Defendant has abandoned the defenses of Laches, Clean Hands and the Statute of Limitations. The contention that Webster is not a valid degree conferring institution under the laws of the District of Columbia has been carefully considered and found to be without merit.

The Court concludes that defendant, acting in combination with its membership and with the Federation, has unreasonably restrained plaintiff's trade in the District of Columbia in violation of Section 3 of the Sherman Act. Lack of regional accreditation harms and inhibits plaintiff in its attempt to compete with institutions which are members of the defendant association and the other regional associations. The Court further finds that defendant's requirement that institutions of higher education be nonprofit organizations with a governing board representing the public interest to be eligible for evaluation and accreditation is unrelated to the legitimate and announced purposes of Middle States and the Federation. This standard for exclusion is arbitrary, unreasonable and contrary to the public interest. Unless enjoined by this Court, defendant's conduct in refusing to consider plaintiff's application for accreditation will cause plaintiff to suffer irreparable injury.

Accordingly, plaintiff is entitled to relief on both counts. An injunction will be issued enjoining defendant from denying plaintiff eligibility for accreditation because of its proprietary character and ordering defendant to accept and evaluate plaintiff's application and to accredit plaintiff if it shall otherwise qualify under defendant's evaluation criteria.

Counsel will submit an order in accordance with this opinion.

Findings of Fact and Conclusions of Law are annexed hereto.

5. Journal of Business Education, May 1967.

472

## FINDINGS OF FACT

1. Plaintiff, Marjorie Webster Junior College, Inc., was founded in 1920 in the District of Columbia as "The Marjorie Webster School of Expression and Physical Education" and operated as a partnership by Miss Marjorie Webster and her mother until 1927 when it was chartered as a corporation for profit, under Section 599 of the Act of March 3, 1901 (D.C.Code, § 29–601, 1967 ed.). Its name was changed to Marjorie Webster Schools, Inc. in 1930 and to its present name in 1947. Plaintiff is a close corporation in which all of the stock is held by members of the Webster family. The members of the Board of Directors of the corporation as well as the present administrative officers of the college are all members of the Webster family.

2. Plaintiff's articles of incorporation provide in part:

To conduct in the District of Columbia * * * a school of physical education and expression, to instruct students in the named and all related subjects, and to issue such certificates and diplomas as may be appropriate to the subject taught and the results accomplished; to do all things necessary and proper for carrying on said school; and in general to do and perform every lawful act and thing necessary or expedient to be done or performed for the efficient and profitable conduct of said business as authorized by the laws of Congress, and to have and to exercise all of the powers conferred by the laws of the District of Columbia upon corporations under said subchapter three (3) of the incorporation laws of the District of Columbia.

3. Plaintiff has operated since 1947 a junior college for women in the District of Columbia known as Marjorie Webster Junior College. It operates two year terminal and transfer courses of instruction. Upon acceptance, students at Webster are advised whether they are being accepted for transfer or terminal credit. Students are admitted specifically as transfer or terminal students. If a student desires to apply to a four year institution upon completion of her terminal course at Webster, she will not receive a transfer recommendation from Webster.

4. Webster is divided into seven departments of instruction designated as Liberal Arts, Physical Education, Kindergartern Education, Communications (Speech-Drama and Radio-T.V.), Secretarial, Art, and Retail Merchandising.

5. Since 1946 Webster has been accredited as a junior college by the District of Columbia Board of Education.

6. Webster grants the degree of Associate in Arts (AA) in each department to students who have completed the department's curriculum with the required average and number of credit hours. Students who matriculate for a full two years but who fail to maintain the required average are given certificates. Since Webster began awarding the AA degree in 1947, approximately 2,300 degrees have been awarded.

7. Webster uses its income to purchase goods and services required to support a program of instruction and necessary auxilliary services. It pays all taxes customarily paid by a business corporation.

8. The present Webster student enrollment is approximately 470 and it is engaged in the recruitment of students and faculty. Throughout the country institutions of higher education are likewise engaged for students and faculty.

9. Defendant is a voluntary, nonprofit, non-stock, educational corporation, organized under the education laws of the State of New York on May 27, 1966 as the Middle States Association of Colleges and Seconday Schools, Inc.

10. It is the successor to the Middle States Association of Colleges and Secondary Schools, an unincorporated nonprofit association established in 1887 for the improvement and development of educational institutions, relationships and services. The institutions of higher ed-

ucation which participated in the founding of this Association were nonprofit, liberal arts institutions.

11. The purposes of Middle States, as stated in its Charter, are:

a. To take over, carry on, and continue the affairs, property, obligations, contracts, and activities of the unincorporated association known as the Middle States Association of Colleges and Secondary Schools, and to pursue the general objectives of that association, to wit, to encourage the achievement of higher quality and to facilitate the development of better working relations among the higher institutions, secondary schools, and other educational agencies in the Middle States.

b. Without limiting the generality of the foregoing, the purposes of the corporation include:

1. To accredit institutions of higher education and of secondary education located within the Middle States area (the States of New York, New Jersey, Pennsylvania, Delaware, Maryland and the District of Columbia as well as those located outside of the continental United States) as provided for in the bylaws of the corporation. It is understood that the process of evaluation and accreditation is itself intended to foster the development of a climate which will be a positive force in realizing the general purpose of the association as stated above;

2. To initiate and sustain such research as may be consistent with the general purpose of the association; and

3. To provide an aegis under which representatives of secondary schools, institutions of higher education, and other educational organizations may meet in the discussion of educational problems and in the common pursuit of solutions to these problems.

12. A Middle States publication, Middle States Membership and Initial Accreditation, lists as Middle States'

purposes, "to serve and protect the educational world and the public by establishing standards of quality and identifying institutions which achieve them" and "to stimulate and help each institution reach its maximum effectiveness."

13. The membership of Middle States consists primarily of institutions of higher education and secondary education which have been accredited by defendant. Membership is concomitant with accreditation. Institutions without accreditation are not admitted to membership. To be eligible for accreditation, an institution of higher education must have graduated at least one class and been in existence for at least two years.

14. Its membership of institutions of higher education includes 346 nonprofit institutions (universities, colleges, junior colleges and specialized institutions) in Delaware, Maryland, New Jersey, New York, Pennsylvania, District of Columbia, Puerto Rico and the Canal Zone. Of these, 106 are state or municipal universities, colleges or junior colleges, 83 are private non-sectarian institutions, 137 are private church related or controlled universities, seminaries or junior colleges, 15 are specilized institutions with concentrated courses of instruction in music, optometry, pharmacy and textiles, one is a special private institution for the deaf, three are federally sponsored military academies and one is a federally sponsored junior college.

15. Membership in Middle States is available to liberal arts colleges as opposed to vocational institutions of higher education. In these institutions, the emphasis is upon a liberal arts curriculum, while vocational education attempts to train the student for a specilized skill or business.

16. Middle States is one of six regional accreditation associations which accredit nonprofit liberal arts institutions.

17. It, as well as the five other regional associations, promulgates standards of quality or criteria of institution-

al excellence and accredits and admits to membership those institutions which it has found to meet its eligibility and evaluative standards. It seeks to determine in broad qualitative terms whether an institution has clearly defined appropriate objectives, whether it has established conditions under which it can reasonably be expected to obtain them, and whether it appears to be attaining them and may be able to continue to do so. Under this criteria, Middle States, in its publication, The Nature of a Middle States Evaluation, notes that "Organization, administration, facilities, and resources are not important in themselves." Accreditation means that the institution has achieved quality within the context of its own aims and program —not that such institution is more qualified than any other accredited or unaccredited institution.

18. Middle States performs the accreditation function through its Commission on Institutions of Higher Education which has the following listed duties:

a. by accreditation, evaluation, consultation, and in all other appropriate ways, to promote in the Middle States territory the welfare and improvement of higher education with special emphasis on service to member institutions but without limitation to these colleges and universities.

b. to adopt from time to time lists of accredited institutions of higher learning in accordance with the standards accepted by this association.

c. to recommend to the association from time to time such changes in its standards for accreditation of institutions of higher education as may be desirable, especially such modifications as will keep the standards in harmony with fully accepted standards for institutions of higher education and promote constant growth of the educational usefulness of member institutions.

d. in accordance with association policy to cooperate in appropriate ways with similar commissions in other regional associations.

19. Evaluation is a process whereby the staff of the Higher Commission and a team of educators from member institutions consult with, advise, and assist an applicant to evaluate its own educational goals and program (self-evaluation) and then have the program examined and reviewed by the team.

20. Accreditation occurs after the team has presented its report to the Higher Commission, which makes the final decision upon the applicant's request.

21. Middle States prepares, maintains and issues annually a list of member institutions. The list of member institutions of higher education is issued semi-annually by the Federation and published by the American Council on Education.

22. Together with the other five regional accrediting associations, Middle States is officially recognized by the United States Commissioner of Education as a reliable authority as to the quality of training offered by educational institutions within their geographical areas.

23. Middle States, as well as the five other regional accrediting associations, awards general accreditation for total institutions and does not separately accredit programs or departments within institutions. This latter form of accreditation is afforded by some 35 national accrediting agencies, which accredit specialized programs in teacher education, engineering, medicine, law, business administration, dentistry, and other specialized areas.

24. Regional accreditation is an integral part of higher education in the United States. Only Middle States furnishes regional accreditation in the District of Columbia area and thus the only manner in which Webster can obtain certification of the quality of its institution which would be widely recognized by the public is through accreditation by Middle States.

25. From at least 1928, Middle States has specifically required that to be eligible for accreditation an institution of higher education must be nonprofit with a governing board representing the public interest. At no time in its existence has the Higher Commission of Middle States evaluated or accredited a proprietary institution. Middle States has based its determination to exclude proprietary schools upon the theory that the profit motive is at odds with the educational process in that the proprietary institution does not devote its total resources to education and that such an institution could not have a disinterested governing board.

26. On or about March 2, 1964, the Commission on Institutions of Higher Education of Middle States, the Commission on Institutions of Higher Education of the New England Association of Colleges and Secondary Schools, Inc., the Commission on Colleges and Universities of the North Central Association of Colleges and Secondary Schools, Inc., the Commission on Higher Schools of the Northwest Association of Secondary and Higher Schools, the Commission on Colleges of the Southern Association of Colleges and Schools, Inc., and the Accrediting Commission for Senior Colleges and Universities and the Accrediting Commission for Junior Colleges of the Western Association of Schools and Colleges did create and establish the Federation of Regional Accrediting Commissions of Higher Education to represent and speak for the six accrediting agencies in matters of common interest, to establish policies and procedures, to exchange information, experience, and personnel, and to cooperate in various ways.

27. On or about March 4, 1964, the Federation issued a policy statement with regard to eligibility for accreditation by the regional associations.

28. This statement included the criterion that the institution "should be a nonprofit organization with a governing board representing the public interest." Defendant has refused to evaluate the merits of plaintiff's educational program for accreditation, basing its refusal upon this nonprofit criterion.

29. There was extensive correspondence between 1928 and the spring of 1966, concerning application for evaluation, accreditation and membership of Webster in Middle States. Webster demanded the right to be examined for evaluation in the spring of 1966. This was rejected by Middle States and the suit followed.

30. As of the time of the institution of this action in June 1966, 28 secondary schools in the District of Columbia were accredited by the Secondary Commission of Middle States and two were candidates for such accreditation; 15 institutions of higher education in the District of Columbia were accredited by the Commission of Higher Education; and two such institutions held "Correspondent Status" with the Commission on Institutions of Higher Education.

31. During the period from January 1, 1964 to October 15, 1966, 13 secondary schools in the District of Columbia were visted by committees of the Commission on Secondary Schools of Middle States in connection with evaluation of such schools for accreditation or review of their accreditation. Each visit by a team or committee listed above was preceded by a visit by the Chairman of the team.

32. In addition to the visits to secondary schools in the District of Columbia by evaluating teams sent in by the Commission, the Chairman of the Commission on Secondary Schools and the Executive Secretary of this Commission visited the District of Columbia on four occasions between February and May of 1966.

33. This Executive Secretary also visited the District of Columbia in October 1966, to meet with the advisory committee of the District of Columbia.

34. As of the time of the institution of this suit, the Commission on Secondary Education distributed a newsletter approximately once a year to all member institutions in the District of Columbia.

35. Since 1927, the Commission on Secondary Schools, as a means of establishing local contacts and of facilitating the work of appraisal of institutions for accreditation, has utilized in an advisory capacity the services, without compensation, of an Advisory Committee in the District of Columbia. The committee consists of representatives of independent private schools, public secondary schools, a representative of the D.C. Board of Education, and a representative of an institution of higher education. The Committee meets once or twice a year to review the reports of evaluation of secondary schools in the District of Columbia and makes recommendations to the full Commission regarding accreditation.

36. The Executive Secretary of the Commission on Institutions of Higher Education, in connection with evaluation for accreditation, visited institutions of higher education in the District of Columbia on four occasions in 1965 and on six occasions between January and May of 1966.

37. Six team members representing the Commission on Institutions of Higher Education visited Holy Cross College in the District of Columbia for an accreditation evaluation from March 1 to March 3 of 1964.

38. Seven team members visited Oblate College in the District of Columbia from March 20 to March 23 in 1966, shortly before the complaint was filed in this case.

39. Middle States collects membership dues once a year from its member institutions in the District of Columbia. It estimates that its total mail volume to the District of Columbia in any one year is 450 pieces of mail. This mail includes annual mailings of membership lists to member institutions, a higher commission newsletter distributed approximately three times a year, and material requested by individuals and institutions in anticipation of the annual convention.

40. It estimates that members of the Middle States' staff have placed approximately 275 telephone calls to persons in the District of Columbia between January 1, 1964 and October 15, 1966.

41. At the time this suit was filed, the President of Middle States was Rev. Charles Martin, Headmaster, St. Alban's National Cathedral School for Boys, Washington, D.C.

42. During 1966, he attended and arranged meetings of Middle States' officers, and corresponded and communicated with Middle States' officers and other persons concerning Middle States' affairs.

43. A meeting of Middle States' officers was held in the District of Columbia in Febrary, 1966, at St. Alban's School, and was attended by five officers of Middle States and the Middle States' Administrative Secretary.

44. Between January, 1964 and October 15, 1966, officers of Middle States visited the District of Columbia on ten occasions.

45. Defendant is not licensed to do business in the District of Columbia, nor does it maintain an office or bank account therein.

46. Due solely to its proprietary status and not its lack of accreditation by defendant, plaintiff does not receive a descriptive listing in American Junior Colleges.

47. The Junior College Directory lists both accredited and non-accredited institutions which are nonprofit. The fact that Webster is proprietary, and not that it is unaccredited by defendant, is the reason for lack of inclusion of Webster in the Junior College Directory.

48. Some of the publications available for use by high school guidance counsellors include:

1. Chronicle Guidance Publications and View Deck, which fully lists Webster.

2. Lovejoy's College Guide, which fully lists Webster.

3. Barron's Guide to the Two-Year Institution, which fully lists Webster.

4. Cass and Birnbaum's Guide to American Colleges, which is limited to four-year institutions and therefore omits Webster.

49. Webster is also fully listed in the newly published Association of College Admissions Officers "Admissions Search Kit", which lists approximately 2,200 institutions of higher education throughout the United States.

50. Membership in the American Association of Junior Colleges (AAJC) is open to both regionally accredited and regionally unaccredited junior colleges. There are a total of 37 non-accredited junior colleges in the Middle States territory which are members of AAJC. AAJC requires an institution to have a nonprofit organization to be eligible. It is this requirement which renders Webster ineligible for membership in AAJC.

51. Plaintiff is eligible to, and does, use the services of the College Entrance Examination Board (CEEB). Plaintiff is listed in the CEEB "Bulletin of Information", with identifying number R5394, which number is used by a student when requesting that her CEEB scores be sent to Plaintiff. Plaintiff is not eligible for membership because of lack of regional accreditation. The "Bulletin of Information" is in the hands of high school students throughout the United States who take the CEEB examinations.

52. The number of applications for admission to Webster for the classes of 1964 through 1970 were as follows:

| Class Year | Applications Received |
| --- | --- |
| 1964 | 658 |
| 1965 | 568 |
| 1966 | 610 |
| 1967 | 814 |
| 1968 | 775 |
| 1969 | 719 |
| 1970 | 594 |

53. The number of applicants denied admission by Webster steadily increased from approximately 100 for the academic year 1960–1961 to approximately 200 in 1963–1964, which number of rejections has continued annually through 1965–1966.

54. The Middle States' Commission on Secondary Schools has accredited the Rhodes School since 1949, the Dwight School since 1928, and the Franklin School since 1928, all in New York City. These three schools are proprietary. With the exception of these three schools, no other proprietary schools are accredited by that Commission.

55. The Western Association of Schools and Colleges has accredited Armstrong College since 1963, Brooks Institute of Photography since 1963, and Woodbury College since 1961, all located in California. These three colleges are proprietary. With the exception of these three institutions, no other proprietary institutions of higher education are accredited by that Commission.

56. Webster has never been accredited by defendant nor its predecessor association.

57. Because Webster lacks regional accreditation, its graduates experience difficulty in transferring credits to senior institutions. At many senior institutions, transfer of credits is either impossible or is granted only on conditions of probation. As a result, Webster students' range of choice of senior institutions is limited.

58. Students of secondary schools who are choosing a college are, in some instances, advised by guidance counsellors to avoid unaccredited schools, partly because of the problems which may be encountered in transferring credits.

59. The process of accreditation itself, is recognized to be a strong force for institutional development and improvement.

60. Educational excellence is determined not by the method of financing but by the quality of the program.

61. Both the Federal and state governments have utilized Middle States and other regional accrediting associa-

tions as agencies to identify institutions as worthy of benefits conferred by the government. The regional accrediting associations have operated as service agencies for the Federal government in determining eligibility for funding. Moreover, Middle States function as an agency to identify institutions of quality is not limited to its relationship with the Federal government. In states under its jurisdiction, it has been recognized as an agency to identify institutions of quality for purposes such as teacher certification, state loans and state scholarships.

62. In recent years the Federal and state Governments have increased their financial outlays to higher education. The Federal government in particular has sharply increased its support. While many of these statutory programs limit grants to nonprofit institutions, the Higher Education Amendments of 1968 do allow participation by proprietary institutions of higher education in the College Work-Study and National Defense Student Loan programs (both basically assist the student rather than the institution). However, both programs require that the institution be accredited by a nationally recognized accrediting agency or association.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the defendant and of this cause of action under 28 U.S.C. § 1337 and Section 12 of the Clayton Act, 15 U.S.C. § 22, since defendant was transacting business in the District of Columbia at the time the suit was filed. The court has jurisdiction over the defendant with respect to count two under the provisions of D.C. Code § 11-521 and 28 U.S.C. § 1391. The court also has pendent jurisdiction of the defendant with respect to count two.

2. Acting in combination with its membership and in combination with the Federation, the defendant has unreasonably restrained the trade of plaintiff.

3. The defendant in performing its accreditation function is engaged in a quasi-governmental function, subjecting it to the restraints of the Constitution.

4. The refusal of the defendant to evaluate the plaintiff's educational program solely because of its corporate form is arbitrary, discriminatory and unreasonable.

5. Accreditation by the defendant association is necessary to the plaintiff if it is to successfully continue to operate as a junior college. Public policy requires that this power of the defendant must be exercised in a reasonable manner in the public interest. Exclusion of plaintiff solely because of its proprietary character is unreasonable and contrary to the public interest.

6. Unless enjoined by this court, defendant's conduct in refusing to consider plaintiff's application for accreditation will cause plaintiff to suffer irreparable injury.

7. Plaintiff is entitled to an injunction prohibiting the defendant from excluding plaintiff from accreditation because of its proprietary character and ordering defendant to accredit plaintiff if it shall otherwise qualify.