**MARJORIE WEBSTER JUNIOR COL-LEGE, INC., a corporation**

v.

**MIDDLE STATES ASSOCIATION OF COLLEGES AND SECONDARDY SCHOOLS, INC., a corporation, Appellant.**

**No. 23351.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1969.

Decided June 30, 1970.
Certiorari Denied Dec. 21, 1970.
See 91 S.Ct. 367.

Mr. Herbert Plaut, New York City, filed a brief on behalf of Pace College, as amicus curiae urging reversal.

Mr. F. William Andres, Boston, Mass., filed a brief on behalf of New England Association of Colleges and Secondary Schools, Inc., as amicus curiae urging reversal.

Mr. Peter P. Walsh, Jr., Trenton, N. J., filed a brief on behalf of The Association of Independent Colleges and Universities in New Jersey, as amicus curiae urging reversal.

Mr. Harry V. Lamon, Jr., Atlanta, Ga., filed a brief on behalf of Southern Association of Colleges and Schools, Inc., as amicus curiae urging reversal.

Mr. L. Dow Nichol, Jr., Chicago, Ill., filed a brief on behalf of North Central Association of Colleges and Secondary Schools, as amicus curiae urging reversal.

Mr. Robert A. Mills, Harrisburg, Pa., filed a brief on behalf of Pennsylvania Association of Colleges and Universities, as amicus curiae urging reversal.

Mr. William F. Hennessey, Seattle, Wash., filed a brief on behalf of Northwest Association of Secondary and Higher Schools, Inc., as amicus curiae urging reversal.

Mr. Herman I. Orentlicher, Washington, D. C., entered an appearance for American Association of University Professors, as amicus curiae urging reversal.

Mr. George M. Courts Oulahan, Washington, D. C., with whom Messrs. Charles S. Rhyne, Benjamin P. Lamberton, III, and Robert H. Culp, Rhyne & Rhyne, Washington, D. C., were on the brief, for appellant.

Mr. C. William Tayler, Washington, D. C., with whom Mr. Edwin R. Schneider, Jr., Washington, D. C., was on the brief, for appellee.

Messrs. John P. Tracey and Peter L. Wolff, Washington, D. C., filed a brief on behalf of the American Bar Association and the Association of American Law Schools, as amici curiae urging reversal.

Mr. John Merrill Scott, Sebastopol, Cal., filed a brief on behalf of Western Association of Schools and Colleges, as amicus curiae urging reversal.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

BAZELON, Chief Judge:

Middle States Association of Colleges and Secondary Schools, Inc., is a voluntary nonprofit educational corporation, the successor to an unincorporated association of the same name established in 1887. Its general purposes are to aid and encourage the development of quality in secondary schools and institutions of higher education located within its geographical domain (New York, New Jersey, Pennsylvania, Delaware, Maryland, and the District of Columbia) or outside of the continental United States. Chief among its activities is that of accrediting member institutions and applicants for membership.[1] Marjorie Webster Junior College, Inc., is a proprietary junior college for women located in the District of Columbia. In 1966, it applied to Middle States for accreditation. Relying upon a policy statement of the Federation of Regional Accrediting Commissions of Higher Education,[2] and upon its own past practice,[3] Middle States refused to consider Marjorie Webster for accreditation because the latter was not "a nonprofit organization with

---

1. Accreditation by Middle States is concomitant with membership.

2. The Federation, which is made up of Middle States and the five other regional liberal arts accrediting associations, was established in 1964 to coordinate the policies of the six associations, to speak for them in matters of common interest, and to exchange information, experience, and personnel.

3. Middle States has never accredited or evaluated a proprietary institution of higher education. This restriction has been explicit since at least 1928. Middle States has, however, accredited three proprietary secondary schools and continues to do so.

a governing board representing the public interest." Following this refusal, Marjorie Webster brought suit to compel its consideration for accreditation without regard to its proprietary character. The District Court found Middle States' refusal to consider proprietary institutions of higher education for accreditation a violation of § 3 of the Sherman Act[4] and of the developing common law regarding exclusion from membership in private associations; in addition, it found that Middle States' activities in the field of accreditation were sufficiently under the aegis of the Federal Government as to make applicable the limitations of the Due Process Clause; and that to deny accreditation to all proprietary institutions solely by reason of their proprietary character was arbitrary and unreasonable, in violation of the Fifth Amendment. Concluding, finally, that continued denial of consideration for accreditation would result in irreparable injury to Marjorie Webster, the District Court enjoined Middle States from denying Marjorie Webster accreditation solely because of its proprietary character, and ordered it to accredit Marjorie Webster if it should otherwise qualify for accreditation under Middle States' standards.[5] On the application of Middle States, we stayed the District Court's order pending our determination of this appeal. For the reasons hereafter set forth, we conclude that the Sherman Act is not applicable to Middle States' con-

duct as indicated by the present record; that the circumstances are not such as to warrant judicial interference with the accreditation and membership policies of Middle States; and that, assuming the Due Process Clause to be applicable, Marjorie Webster has not sustained its burden of showing the irrationality of the policy in question as applied to bar consideration of Marjorie Webster for accreditation. Accordingly, we reverse the judgment of the District Court.

## I.

Appellee strongly urges, and the court below concluded,[6] that once it be determined that appellee is engaging in "trade," restraint of that "trade" by appellant's conduct is subject to the limitations of the Sherman Act.[7] If this were the ordinary case of a trade association alleged to have transgressed the bounds of reasonable regulation designed to mitigate the evils afflicting a particular industry,[8] this reasoning might be conclusive.[9] But in our view, the character of the defendant association, and the nature of the activities that it regulates, require a finer analysis.

Despite the broad wording of the Sherman Act,[10] it has long been settled that not every form of combination or conspiracy that restrains trade falls within its ambit.[11] For the language of the Act, although broad, is also vague; and in consequence of that vagueness, "perhaps not uncalculated, the courts

4. 15 U.S.C. § 3 (1964).

5. Marjorie Webster Junior College, Inc., v. Middle States Ass'n of Colleges & Secondary Schools, Inc., 302 F.Supp. 459 (D.D.C.1969).

6. *Id.* at 466.

7. Appellee does not suggest that appellant's accreditation activities constitute a *per se* violation of the Act, but only that the "rule of reason" should apply.

8. *See, e. g.*, Sugar Institute, Inc., v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *compare*

Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1967).

9. *See* American Medical Ass'n v. United States, 72 U.S.App.D.C. 12, 110 F.2d 703, cert. denied, 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411 (1940).

10. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in * * * the District of Columbia * * * is declared illegal.
15 U.S.C. § 3 (1964).

11. Standard Oil Co. v. United States, 221 U.S. 1, 59–60, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

have been left to give content to the statute, and in the performance of that function it is appropriate that courts should interpret its word in light of its legislative history and of the particular evils at which the legislation was aimed."[12] The Act was a product of the era of "trusts" and of "combinations" of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern.

Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–493, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). "The Court in Apex recognized that the Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives."[13]

■■■ That appellant's objectives, both in its formation and in the development and application of the restriction

here at issue, are not commercial is not in dispute.[14] Of course, when a given activity falls within the scope of the Sherman Act, a lack of predatory intent is not conclusive on the question of its legality.[15] But the proscriptions of the Sherman Act were "tailored * * * for the business world,"[16] not for the noncommercial aspects of the liberal arts and the learned professions.[17] In these contexts, an incidental restraint of trade, absent an intent or purpose to affect the commercial aspects of the profession,[18] is not sufficient to warrant application of the antitrust laws.

■■■ We are fortified in this conclusion by the historic reluctance of Congress to exercise control in educational matters.[19] We need not suggest that this reluctance is of such depth as to immunize any conceivable activity of appellant from regulation under the antitrust laws.[20] It is possible to conceive of restrictions on eligibility for accreditation that could have little other than a commercial motive; and as such, anti-

12. Apex Hosiery Co. v. Leader, 310 U.S. 469, 489, 60 S.Ct. 982 (1940) (footnote omitted).

13. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959).

14. See 302 F.Supp. at 466.

15. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

16. Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 141, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

17. Compare Greene v. Howard University, 134 U.S.App.D.C. 81, 88, 412 F.2d 1128, 1135 (1969).

18. Compare American Medical Ass'n v. United States, 317 U.S. 519, 528–529, 63 S.Ct. 326, 328, 87 L.Ed. 434 (1943):
As the Court of Appeals properly remarked, the calling or occupation of the individual physicians charged as defendants is immaterial if the *purpose and effect* of their conspiracy was * * * obstruction and restraint of the business of Group Health. * * * Whether the conspiracy was *aimed at* restraining or destroying competition, or had *as its purpose* a restraint of the free

availability of medical or hospital services in the market, the *Apex* case [*supra* note 12] places it within the scope of the statute. [emphasis supplied]
*See also* United States v. Oregon Medical Society, 343 U.S. 326, 336, 72 S.Ct. 690, 96 L.Ed. 978 (1952); Semler v. Oregon State Bd. of Dental Examiners, 294 U.S. 608, 612, 55 S.Ct. 570, 79 L.Ed. 1086 (1935).

19. *E. g.*, 20 U.S.C. § 401 (1964): "The Congress reaffirms the principle and declares that the States and local communities have and must retain control over and primary responsibility for public education." *Id.* § 402: "Nothing contained in this Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution or school system."

20. Compare the treatment of labor unions in United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Allen Bradley Co. v. Local No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

trust policy would presumably be applicable.[21] Absent such motives, however, the process of accreditation is an activity distinct from the sphere of commerce; it goes rather to the heart of the concept of education itself.[22] We do not believe that Congress intended this concept to be molded by the policies underlying the Sherman Act.

## II.

■ The increasing importance of private associations in the affairs of individuals and organizations has led to substantial expansion of judicial control over "The Internal Affairs of Associations not for Profit."[23] Where membership in, or certification by, such an association is a virtual prerequisite to the practice of a given profession, courts have scrutinized the standards and procedures employed by the association notwithstanding their recognition of the fact that professional societies possess a specialized competence in evaluating the qualifications of an individual to engage in professional activities.[24] The standards set must be reasonable, applied with an even hand, and not in conflict with the public policy of the jurisdiction.[25] Even where less than complete exclusion from practice is involved, deprivation of substantial economic or professional advantages will often be sufficient to warrant judicial action.[26]

■ The extent of judicial power to regulate the standards set by private professional associations, however, must be related to the necessity for intervention.[27] Particularly when, as here, judicial action is predicated not upon a legislative text but upon the developing doctrines of the common law, general propositions must not be allowed to obscure the specific relevant facts of each individual case. In particular, the extent to which deference is due to the professional judgment of the association will vary both with the subject matter at

21. For example, if accreditation were denied any institution purchasing textbooks from a supplier who did not provide special discounts for association members, it would be hard to imagine other than a commercial motive for the action.

22. See text at note 36 *infra*.

23. This is the title of Professor Chafee's germinal articles published in 43 Harv.L. Rev. 992, 1023 (1930). For more recent surveys, see, *e. g.*, Developments in the Law—Judicial Control of Actions of Private Associations, 76 Harv.L.Rev. 983 (1963); Note, Exclusion from Private Associations, 74 Yale L.J. 1313 (1965).

24. The leading case is Falcone v. Middlesex County Medical Soc'y, 34 N.J. 582, 170 A.2d 791 (1961). *See also* James v. Marinship Corp., 25 Cal.2d 721, 155 P.2d 329 (Calif.1945); Pinsker v. Pacific Coast Soc'y of Orthodontists, 75 Cal. Rptr. ·712 (Ct.App.1969).

25. Higgins v. American Soc'y of Clinical Pathologists, 51 N.J. 191, 238 A.2d 665 (1968). The classic statement of the rationale for judicial intervention is that of the New Jersey Supreme Court in *Falcone, supra* note 24, 170 A.2d at 799:

When courts originally declined to scrutinize admission practices of membership associations they were dealing with social clubs, religious organizations and fraternal associations. Here the policies against judicial intervention were strong and there were no significant countervailing policies. When the courts were later called upon to deal with trade and professional associations exercising virtually monopolistic control, different factors were involved. The intimate personal relationships which pervaded the social, religious and fraternal organizations were hardly in evidence ·and the individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appeared as the controlling policy consideration.

26. Pinsker v. Pacific Coast Soc'y of Orthodontists, *supra* note 24.

27. "All grants of power * * * are subject to the inherent limitation that the power shall be fairly used for the purpose for which it is conferred." Sacher v. United States, 343 U.S. 1, 29, 72 S.Ct. 451, 464, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting).

issue[28] and with the degree of harm resulting from the association's action.[29]

With these factors in mind, we turn to consider the harm appellee will suffer by virtue of the challenged exclusion. We note in this regard that denial of accreditation by Middle States is not tantamount to exclusion of appellee from operating successfully as a junior college. It has been, and without regard to accreditation by appellant will remain, accredited by the District of Columbia Board of Education, and licensed to award the Associate in Arts degree.[30] The record indicates that appellee's listing in the major publications available for use by high school guidance counsellors (and often, by students and their families) does not depend upon its ac-

creditation by appellant.[31] Appellee's lack of accreditation does not appear to render it, or its students, ineligible to receive federal aid.[32] Appellee's students seeking to transfer to four-year colleges at the completion of their programs are not necessarily barred from obtaining credit for their studies because of the unaccredited status of the institution.[33] We recognize, as the trial court found,[34] that lack of accreditation may be a not insignificant handicap to appellee both in the effect that such lack may have on students considering application for admission, and in the loss of the substantial benefits that the accreditation process itself has upon the institution under study. But appellee has operated successfully as a junior college since 1947.

28. Less deference may be due professional judgment when the question is not one of substantive standards, but rather one concerning the fairness of the procedures by which the challenged determination was reached. In the present case, however, no such issue is raised.

29. In the present context, where the question is one of the validity of a general standard, we see no benefit to be gained for our analysis by consideration of the distinction sometimes drawn between cases involving admission to, and those involving expulsion from, professional associations. *E. g.*, Hurwitz v. Directors Guild of America, Inc., 364 F.2d 67 (2d Cir. 1966). In either case the critical question would seem to be the extent of harm suffered by the person excluded or expelled.

30. We need not and do not express any opinion on the question, argued both here and in the court below, whether appellee's local accreditation and licensure are proper.

31. Appellee is not listed in either the Junior College Directory, which lists both accredited and unaccredited institutions but not proprietary ones; or in Cass & Birnbaum's Guide to American Colleges, which lists only four-year colleges. It is fully listed in Lovejoy's College Guide; Barron's Guide to the Two-Year Institution; Chronicle Guidance Publications and View Deck; and the Association of College Admissions Officers' Admissions Search Kit. 302 F.Supp. at 475–476.

32. Eligibility for a number of federal funding programs that provide grants to in-

stitutions or their students does turn upon the institution's being accredited by a "nationally recognized accrediting agency" listed by the Commissioner of Education. *See, e. g.*, 20 U.S.C. § 403(b) (5) (National Defense Education Act of 1958), 751(f) (5) (grants and loans for construction of academic facilities) (1964 & Supp. IV, 1969). However, as an alternative to such accreditation, an institution or its students will become eligible upon showing that its credits "are accepted on transfer by not less than three institutions which are so accredited, for credit on the same basis as if transferred from an institution so accredited." *Id.* §§ 403(b) (5) (B), 751 (f) (5). This is known as "three-letter certification," and appellee has such certification at the Office of Education. It appears that appellee is ineligible for federal funds, if at all, because the applicable statutes preclude grants and loans to proprietary liberal arts institutions or their students. *See, e. g.*, 20 U.S.C. §§ 403(b) (4), 403(b) (5) (B) and following material, 751(f) (4) (1964 & Supp. IV, 1969).

33. It appears that some 34 educational institutions throughout the United States refused to give full credit to appellee's transfer students in the period 1962–1969. Appellee was able to show only 11 such institutions which did so because of its lack of accreditation by appellant. *See also* note 32 *supra*.

34. 302 F.Supp. at 477.

Although it suffered a decline in applications for admission in the years immediately preceding the instant suit, this decline was shared by the other women's institutions in the District of Columbia. In the last year for which figures were introduced, it received over 100 more applications than Mount Vernon Junior College, the institution receiving the second highest number.[35] We do not believe, therefore, that the record supports the conclusion that appellee will be unable to operate successfully as a junior college unless it is considered for accreditation by appellant.

Accordingly, we believe that judicial review of appellant's standards should accord substantial deference to appellant's judgment regarding the ends that it serves and the means most appropriate to those ends. Accreditation, as carried out by appellant, is as involved with educational philosophy as with yardsticks to measure the "quality" of education provided. As found by the trial court,

> [Appellant] seeks to determine in broad qualitative terms whether an institution has clearly defined appropriate objectives, whether it has established conditions under which it can reasonably be expected to obtain them, and whether it appears to be obtaining them. Under this criteria [sic], Middle States, in its publication, The Nature of a Middle States Evaluation, notes that "Organization, administration, facilities, and resources are not

important in themselves." Accreditation means that the institution has achieved quality within the context of its own aims and program—not that such institution is more qualified than any other accredited or unaccredited institution.[36]

Appellee does not challenge this view of the accreditation process as improper. And given this view, we cannot say that appellant's refusal to consider proprietary institutions is an unreasonable means of seeking to reach the ends sought. Of course no institution, no matter how well endowed, can afford to entirely ignore the balance sheet. But when the institution itself is responsible in large part for setting the measure by which it is to be judged, we do not think it has been shown to be unreasonable for appellant to conclude that the desire for personal profit might influence educational goals in subtle ways difficult to detect but destructive, in the long run, of that atmosphere of academic inquiry which, perhaps even more than any quantitative measure of educational quality, appellant's standards for accreditation seek to foster.[37] Likewise, we may recognize that, even in nonprofit institutions, the battle for academic freedom and control of educational policy is still sporadically waged; but this factor would seem to strengthen, rather than weaken, the reasonableness of appellant's judgment that motives of personal profit should not be allowed to influence the outcome.[38] Finally, we need not say that appellant's views of

---

35. The number of applicants annually rejected by appellee remained at approximately 200 for the three years last preceding the instant suit.

36. 302 F.Supp at 474.

37. Needless to say, a failing institution may be forced to sacrifice its own view of educational quality for economic reasons, and doubtless even the best-endowed university would be grateful for additional funds to spend on education. But where funds may not be siphoned off from educational purposes, even the most stringent budget-cutting must find its limit. We need not here decide how

or whether our conclusion would differ if appellee could show that its profits could never exceed a certain amount or percentage of income, in which case the profit-taking aspect of its operations would, as in the case of nonprofit institutions, have a definite limit.

38. Appellee rightly points out that proprietary as well as nonproprietary institutions could, in theory, establish a system of academic tenure and faculty control of academic policy. Appellee, however, has established neither; and we think that judicial consideration of the consequences of any such systems, if established, should await their existence.

the proper measure for accreditation of an educational institution are the only, the best, or even particularly well chosen ones. The core of appellant's argument is not that proprietary institutions are unworthy of accreditation, but rather that they, like many trade and professional schools, should properly be measured by standards different from those used by appellant, and which appellant is possessed of no special competence or experience in using. In this regard appellee is unlike the individual denied membership in or certification by a professional society. Rarely, if ever, could it be said that such an individual could realistically be expected to combine with others excluded on the same grounds [39] to form his own association. Appellee, however, is free to join with other proprietary institutions in setting up an association for the accreditation of institutions of such character; and such an association, if recognized,[40] could obtain for its members all the benefits of accreditation by appellant save, perhaps, prestige. Appellee has made no attempt to show that any such course has ever been attempted. In these circumstances, we do not think that appellant's refusal to consider appellee for accreditation as a proprietary institution lacks sufficient basis in reason to warrant judicial intervention.

In reaching this conclusion, we need neither disregard nor disbelieve the extensive testimony introduced by appellee below regarding the values and benefits, both for the educational process and for the country as a whole, that flow from proprietary educational institutions. We do not conclude, nor does appellant even suggest, that competition from proprietary institutions is anything but wholesome for the nonprofit educational establishment. We merely find that, so far as can be discerned from the present record, appellant does not wield such monopoly power over the operation of educational institutions that its standards for accreditation may be subject to plenary judicial review; and that in light of the substantial latitude that must accordingly be allowed appellant in setting its criteria for accreditation, appellee's exclusion solely on the basis of its proprietary character is not beyond the bounds of appellant's allowable discretion.

### III.

What has been said above should also dispose of so much of appellee's argument as is based upon the Due Process Clause. We may assume, without deciding, that either the nature of appellant's activities[41] or the federal recognition which they are awarded[42] renders them state action subject to the limitations of the Fifth Amendment.[43] If so, however, the burden remains with appellee to show the unreasonableness

**39.** Of course, if the exclusion were not pursuant to a general policy but directed solely towards an individual person or organization, even this possibility would be lacking. Accordingly, judicial scrutiny of the even-handed application of purported standards of exclusion is correspondingly more stringent. *Compare* Pinsker v. Pacific Coast Soc'y of Orthodontists, *supra* note 24.

**40.** Accrediting agencies are accorded formal recognition by the National Commission on Accrediting. Comment, The Legal Status of the Educational Accrediting Agency: Problems in Judicial Supervision and Governmental Regulation, 52 Cornell L.Q. 104, 105–106 (1966). In addition, the Commissioner of Education is instructed to "publish a list of nation-

ally recognized accrediting agencies or associations which he determines to be reliable authority as to the quality of training offered." 20 U.S.C. § 403(b) (Supp. IV, 1969).

**41.** *Compare* Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Steele v. Louisville & Nashville R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

**42.** *See* note 32 *supra*.

**43.** *See generally* Adickes v. S. H. Kress & Co., 398 U.S. 144, 189–205, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring and dissenting), and cases cited.

of the restriction,[44] not simply in the abstract but as applied specifically to it.[45] We need not decide here the precise limits of those circumstances under which governmental action may restrict or injure the activities of proprietary educational institutions. For the reasons already discussed,[46] we conclude that appellee has failed to show that the present restriction was without reasonable basis. Accordingly, it must be upheld.

Reversed.

44. Goldblatt v. Town of Hempstead, 369 U.S. 590, 596, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962).

45. *Compare* United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

46. Notes 30–41 *supra* and accompanying text.