**WILFRED ACADEMY OF HAIR AND BEAUTY CULTURE, HOUSTON, TEXAS, Wilfred Academy of Hair and Beauty Culture, Houston, Texas, Wilfred Academy of Hair and Beauty Culture, Tampa, Florida, Wilfred Academy of Hair and Beauty Culture, Hollywood, California, Wilfred Academy of Hair and Beauty Culture, Los Angeles, California, and Wilfred Academy of Hair and Beauty Culture, Hawthorne, California Plaintiffs,**

v.

**The SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS and The Commission on Occupational Education Institutions, Defendants.**

Civ. A. No. H–89–3846.

United States District Court,
S.D. Texas,
Houston Division.

May 4, 1990.

institutions providing training in cosmetology. It is stipulated by the parties that the Plaintiffs provide quality education to their students, most of whom are members of socio-economically disadvantaged groups. Except for the Tampa School, each School is accredited exclusively by the Southern Association of Colleges and Schools (SACS), an independent, nationally recognized accrediting commission. Plaintiffs are licensed by the states in which they operate and all participate in federal student financial assistance programs.

Defendant SACS is a non-profit entity incorporated in the State of Georgia. SACS is authorized by Secretary of the United States Department of Education as a nationally recognized accrediting agency to act as a reliable authority on the quality of training offered by the schools it accredits. Accreditation by an authorized, nationally recognized accrediting agency is required before schools are eligible to participate in the federal student financial assistance programs. Defendant SACS accredits each of the Plaintiffs and has issued a letter withdrawing that accreditation due to circumstances described below.

Defendant Commission on Occupational Education Institutions (COEI) is an independent branch of SACS that administers the accreditation process. COEI's purpose is to identify occupational education institutions which qualify for accreditation by meeting the standards, policies, and procedures of COEI. (The Court will sometimes refer to COEI and SACS collectively as the Defendants.)

FACTS

*Background*

To become accredited by SACS, each institution must conform to its policies, standards, and procedures. Additionally, each institution must complete a self-study, be reviewed by a team of COEI representatives, respond to the team's report, if necessary, and be accepted by a majority vote of COEI. In 1982 the Tampa School became a candidate for SACS accreditation, and in December 1983 it was accredited by

Michael Robbins, Doyle, Reed, Restrepo, Harvin & Robbins, Houston, Tex., Leigh Manasevit, Brustein & Manasevit, Washington, D.C., for plaintiffs.

R. Mason Barge, Atlanta, Ga., Terri Griffith, Houston, Tex., for defendants.

OPINION

SINGLETON, District Judge.

THE PARTIES

The Plaintiffs ("Schools" or "Wilfred Academy") are post-secondary educational

SACS. The remaining Schools were accredited at various times through October 1988.

When this action began ten Wilfred Schools were accredited by SACS. Of these ten, six carry dual accreditation. The Plaintiffs' main campus, located in Tampa, Florida, and schools located in Miami, Orlando, North Miami Beach, and Ft. Lauderdale, Florida, and Hollywood, California, are accredited by both SACS and NACCAS. These Schools are individually accredited by NACCAS as "main campuses." With SACS the Schools are accredited as "branches" to the main campus in Tampa. The remaining four Schools (Plaintiffs in this action) are accredited by SACS only.

*The Team Report and Initial Responses*

In March 1988 COEI representatives visited the Tampa School and ten of its SACS branches to determine compliance with the Commission's policies, standards, and procedures before reaffirming accreditation. Of the eleven schools visited by the COEI team two are Plaintiffs in this action: the Tampa School and the Los Angeles School. Three other Plaintiff Schools—two in Houston, Texas, and one in Hawthorne, California—were opened and accredited by SACS after the March 1988 visit. Three Schools visited by the team in Miami (Bird Road), Hialeah, and St. Petersburg, Florida, have since closed.

Pursuant to the March compliance visit, the COEI representatives prepared a report which described the visit as "informative" and positive, noting that the representatives were treated with "respect, dignity and professionalism." Mr. Kenneth Lochridge, one of the team members, praised the Schools on their management, stating that they were "running a good operation" and were "exceptional." The report recommended changes for the media services at some of the Schools, alteration of the Schools' refund policy to comply with SACS' refund policy in effect at that time, implementation of a long-range plan for improvement in the physical facilities, and improvement in maintaining the security of student records. The report also noted in an Appendix "M," which was simply a checklist of the team's recommendations, and *without recommendation*, that the Schools' accreditation status with NACCAS differed from the accreditation status with SACS.

Pursuant to COEI's procedures, visited schools are required to respond to the recommendations in the Team Report. In May 1988 the Tampa School responded to the recommendations in COEI's Team Report on behalf of itself and its branches. The Plaintiffs complied with the recommendations regarding the media services, the long-range improvement plan, and the security of student files. Those findings were resolved and are no longer at issue. Since no recommendation was made as to the dual accreditation, the Schools' response included no reference to the matter.

In response to the recommendation regarding refunds, the Schools noted that their refund policy complied with NACCAS rules and the various state licensing requirements and suggested to COEI that it revise its refund policy to permit a school with dual accreditation to use the refund policy of either accrediting agency. The NACCAS refund policy differed only slightly from the SACS' 1988 policy, and SACS had been regularly notified of the Schools' use of the NACCAS refund policy. The Schools correctly pointed out that a switch to SACS' policy would unfairly prejudice evening students, who made up a substantial portion of their student population. The Schools expressed their desire to retain their refund policy for reasons of consistency, uniformity, and fairness.

By a letter dated July 13, 1988, which was not received by Plaintiffs until October 1988, the Plaintiffs were advised that COEI had met and considered its April 1988 Team Visit Report, the Plaintiffs' self-study, and the Plaintiffs' May 1988 Institutional Response to the report. COEI delayed reaffirmation of accreditation of the Tampa School until the School "provided documentary evidence that the main campus and all branches have in operation a *refund policy* that does comply with the standards and

policies of COEI." [1] COEI made no mention of any problems concerning dual accreditation or lack of full disclosure of information.

In September 1988 the Plaintiffs submitted applications to SACS for accreditation of its schools in Houston, Texas, and Hawthorne, California. In October COEI again met and again reviewed the Team Report and the Schools' Institutional Response and other supporting documents. At this meeting COEI accredited the Plaintiffs' Schools in Houston, Texas, and Hawthorne, California, as branch campuses, *although they had not adopted the SACS refund policy.* Instead, the Schools maintained only the NACCAS refund policy and had sent to COEI catalogs and enrollment agreements reflecting their policy. This approval, which was not conditional in any way, led the Plaintiffs to believe that their suggested change in SACS' refund policy had been adopted. The Schools received notification of the accreditations in October and November of 1988.

*The Show Cause Orders and Related Communications*

Inexplicably, at the same meeting at which COEI approved accreditation of Schools using the NACCAS refund policy, COEI decided to issue against the Schools an Order to Show Cause for non-compliance with its *Policies & Standards.* The Show Cause Order, issued approximately one month later by a letter dated November 7, 1988, gave the Schools thirty days to show cause "why they should not be dropped from accreditation for non-compliance" with COEI's refund policy. Pursuant to the Order the Schools immediately responded to COEI that they would conform their policy to that of COEI within two months.

In December 1988 COEI met and for the third time reviewed the April Team Report, the Schools' Institutional Response, and other materials. No action was taken on the November 7, 1988, Order to Show Cause. COEI again delayed reaffirmation of accreditation and for the first time requested documentation relating to COEI's newly established "dual accreditation" rules, which became effective in July 1988. Under the new policy any institution accredited by both COEI and any other nationally recognized accrediting body "must describe itself in identical terms to each recognized accrediting body with regard to purpose, governance, programs, degrees, diplomas, certificates, personnel, finances, and constituents." *Policies and Standards,* 19 (Commission on Occupational Education Institutions, 1988).

The December 5, 1988, letter, which was received by the Plaintiffs on January 31, 1989, requested the Plaintiffs to "submit documentation from ... [NACCAS] identifying the locations of Wilfred Academy in identical terms as is with [COEI], regarding main and branch campus designation." Plaintiffs were justifiably surprised to hear this issue raised at this late date, as noncompliance was raised in neither the April 1988 Team Report, nor in COEI's July 1988 reply to the Plaintiffs' May 1988 Institutional Response. Most significantly, the issue of main or branch designation was not mentioned in COEI's November 7, 1988, Order to Show Cause.

COEI had never clarified exactly what was required of any institution under this policy, but as to the Plaintiffs, COEI interprets this vaguely worded rule to require identical wording regarding the "freestanding" or "branch" status of the Schools with all accrediting bodies. However, under Defendants' *Policies and Standards,* the meanings of the terms "branch" and "freestanding" are virtually the same. According to COEI policy, a "branch" is a "subordinate facility, capable of total freestanding operation under the supervision of a full-time, on-site, local administrator who reports to the chief administrator at the parent institution." *Policies and Standards,* at 25. A "freestanding institution" is a school which may have operated as a branch for two years, with all the services of a freestanding institution, and which

---

**1.** Since the Tampa School was accredited by SACS as a main campus, any adverse accreditation decision with regard to the Tampa School would adversely affect its branch campuses.

applies for and is granted freestanding status. *Id.*

The Defendants have argued that Appendix "M" to the Team Report provided the Plaintiffs with a warning that they were in violation of the dual accreditation policy. The Court, however, finds that Appendix "M" is incomprehensible and did not rise to the level of a warning or notice of any concern over dual accreditation.

At another December 1988 meeting the Delegate Assembly of COEI revised the *Policies and Standards* for refunds in accordance with the suggestion first made by the Plaintiffs in their Institutional Response of May 1988. The revision allows an institution accredited by another accrediting agency prior to being accredited by COEI to continue to use that agency's refund policy, even if it is inconsistent with the SACS policy. Under this revision, the Plaintiffs were not in violation of SACS refund policy, although the revision was to take effect six months later on July 1, 1989.

In January 1989 the Schools received notification from SACS of its revised refund policy and of its effective date of July 1, 1989. Plaintiffs reasonably understood this adoption of its suggested revised refund policy to obviate their need to change their refund policy for the short duration of the COEI's older refund policy. Nevertheless, the Schools immediately asked for and received an oral waiver of this date from the Assistant Executive Director of SACS. The Plaintiffs then justifiably halted implementation of their revised refund policy. The Plaintiffs' understanding that they did not need to change their refund policy was also supported by COEI's recent accreditation of the Plaintiffs' new branches in Houston, Texas, and Hawthorne, California. In fact, Plaintiffs were advised by SACS staff that this understanding was correct.

On March 27, 1989, the Defendants issued the Show Cause Order at issue in this case, without ever making a determination on its November 7, 1988, Show Cause Order. The March Show Cause Order again alleged that the Schools had violated COEI's refund policy, and the new Order also added the claims that the Schools violated COEI's new dual accreditation standards (i) by accrediting its campuses in Miami, St. Petersburg, Orlando, North Miami Beach, and Ft. Lauderdale, Florida, and Hollywood, California, as "freestanding" with NACCAS and as "branches" with SACS; (ii) by failing to submit a 1986 Annual Report in a timely manner; and (iii) by failing to disclose to COEI information pertaining to policies, standards, and procedures of COEI. This Show Cause Order was the first effective notice to the Schools that COEI alleged some violation of the dual accreditation provision and a failure to disclose information. It also resurrected the issue of the 1986 Annual Report that had long been resolved.

In April 1989 the Plaintiffs timely responded to the Show Cause Order by letter. The Plaintiffs emphasized the Defendants' delay in acting upon the alleged dual accreditation violation. The Plaintiffs also responded that although they believed that their campuses did, in fact, describe themselves to NACCAS and to SACS in the same terms regarding purpose, governance, programs, degrees, diplomas, certificates, personnel, finances, and constituents, they were nevertheless willing to apply to SACS for freestanding status in order to make the terms of SACS and NACCAS accreditation identical in even the minutest detail. In fact, the Plaintiffs had already initiated the internal steps to make such an application and so informed the Commission at its May 8, 1989, meeting. Wilfred submitted the completed applications for freestanding status to SACS on May 19, 1989.

The Plaintiffs also reminded COEI that they always endeavored to file their Annual Report in a timely manner and that the 1986 report had long since been filed. In fact, the late filing of the 1986 Annual Report had been the subject of a prior Show Cause Order. In response to that Order, the report was filed. The matter had been resolved for over two years. Plaintiffs were understandably amazed to see this matter resurrected in March 1989.

In response to the alleged violation of the refund policy, the Schools reminded COEI of their previous suggestions that COEI revise its refund policy for dually accredited schools in order to permit dually accredited schools to conform to the policy of the original accrediting body. Nevertheless, the Schools expressed their immediate willingness to change their refund policy for the remaining two months and included a proposal for that change. As the Schools stated in their response to the March Show Cause Order,

> Our intention is to adhere to the refund policy of the Commission. However, we misunderstood the fact that SACS wanted us to change our policy for the short period involved. Enclosed ... you will find a proposed change to our refund policy which adheres to both NACCAS and SACS refund requirements. Once we receive your approval, we will immediately proceed to implement this change.

In response to the charge of failure to provide information, the Schools said they had never refused or withheld any information and that their information had always been accurate. Due to the vagueness of this charge, the Plaintiffs later requested notice of the specific items allegedly withheld. Amazingly, that request for notice was denied.

COEI met on May 8, 1989, to consider the Schools' response to the March 1989 Show Cause Order. After that meeting, but before COEI's decision, the Plaintiffs took further steps which were specifically designed to rectify any remaining alleged violations of SACS policies. To remedy the alleged violation of COEI's 1988 refund policy, the Schools sent COEI their newly-printed Enrollment Agreements in May 1989. The Agreements contained a refund policy revised to comply with the COEI 1988 policy then in effect. In yet another example of COEI's intransigence, COEI's June 16, 1989, reply was that it had no procedure to review and approve the Enrollment Agreements! The Plaintiffs

nevertheless implemented the new refund policy.

On May 19, 1989, the Schools applied to COEI for freestanding accreditation for their Schools in Miami, North Miami Beach, Ft. Lauderdale, and Orlando, Florida, Hollywood and Los Angeles, California, and Houston, Texas, in order to make identical the Schools' accreditation status with NACCAS and SACS.[2] The Plaintiffs had then completed steps to be in compliance with SACS' policy regarding dual accreditation, as SACS apparently interpreted the policy. After COEI's delayed response to the Plaintiffs' application, COEI then arbitrarily refused to process the Plaintiffs' application for freestanding accreditation, stating that it would not process the applications while the Plaintiffs' appeal was pending. This refusal blocked the Plaintiffs' attempts to remedy their alleged non-compliance with the SACS dual accreditation rule.

*Accreditation is Dropped*

By letter dated May 19, 1989, COEI notified the Plaintiffs that their accreditation had been dropped, effective immediately. The letter gave no reasons for the decision. By letter dated May 23, 1989, the Schools notified COEI of their intent to appeal the decision. The appeal reinstated the Schools' accreditation with SACS pending disposition of the appeal.

Because of the vagueness of COEI's May 1989 notification letter, in June 1989 the Schools requested a specific statement of the reasons for COEI's decision. Again, in an incredible Catch-22, COEI refused the Schools' request, stating that its procedures did not authorize such a statement. In fact, COEI never provided any reasons for its adverse accreditation action against the Schools. The Court finds that COEI's initial and continued refusal to work with the Plaintiffs on accreditation matters, or even to provide the Schools with effective notice of the specific charges against them, were arbitrary, capricious, fundamentally unfair, and some evidence of malice.

**2.** This application represented the culmination of a process that had been commenced in early 1989 when Plaintiffs were first apprised of

SACS' contention that there was a problem with their dual accreditation status.

The COEI Appeal Board held a hearing on September 11, 1989, after which the Board prepared a report of its decision. The Appeal Board issued a finding on each of the four alleged violations, agreeing with the Commission on its decision to drop accreditation. But the Appeal Board overturned any finding based upon the alleged late filing of the 1986 Annual Report, reasoning that the Commission had granted extensions of time to the Plaintiffs and that the Report was eventually filed. The Court finds that COEI's pursuit of such a meritless claim against the Plaintiffs is further evidence of COEI's malice.

In order to resolve the issue of their compliance with SACS' dual accreditation rule, the Plaintiffs offered at the appeal hearing to immediately relinquish SACS' accreditation of all the Schools accredited by both SACS and NACCAS. The Board refused, claiming that the Schools' offer came too late to be considered as a remedy. Any corrective measures taken by the Schools were unavailing, according to the Board.

FINDINGS AND ANALYSIS

█ The Court finds that the testimony of Plaintiffs' witnesses, Mr. Gerard Thornton, Mr. Guido Sanchez, and Mr. Ira Menkes, was forthright, credible, and consistent with the documentary evidence submitted by both parties. The Court bases its factual findings on the testimony of those witnesses and the exhibits presented at trial.

The corporate structure of the Wilfred Academies and their corporate parent, Wilfred American Education Corporation, was fully and consistently disclosed to SACS and COEI from the first school's application for accreditation in 1982 through 1988, when two new branches— one in Houston, Texas, and one in Hawthorne, California—were accredited by SACS.

The Court further finds that for SACS accreditation purposes, the Plaintiffs' branch campuses were subordinate to the "main" Tampa campus. This structure is appropriate and consistent with the *Policies and Standards* of COEI. The fact that for accreditation purposes of another, completely separate accrediting association, NACCAS, some of the Schools are designated as "freestanding" is not a violation of the *Policies and Standards* of COEI.

The vague language of the dual accreditation provision does not require identical reporting of main campus or freestanding status to different accrediting bodies. Similarly, no rational purpose is served by requiring such identical reporting. The Plaintiffs gained no benefit from the different reporting, and SACS has shown no legitimate interest in such identical reporting. Significantly, COEI's own policies require a "branch" to be capable of "freestanding" status. The different accreditation status with NACCAS and SACS was not undertaken by the Schools to gain any benefit from the federal programs for student financial assistance. In fact, those Schools already accredited by NACCAS are able to participate in the programs even without SACS' accreditation.

These federal programs include certain federal grant and guaranteed loan programs administered by the United States Department of Education. Approximately ninety-five per cent of each school's students receive assistance under one or more of these programs. For those students receiving financial assistance, the programs fund substantially all of their tuition. Thus, the withdrawal of federal financial assistance would, in virtually all cases, render the student unable to continue his or her education. Additionally, from 1982 through 1989, between eighty-five per cent and ninety-five per cent of each School's revenues were derived from funds obtained by students through grant and loan programs. Consequently, each School's financial viability is entirely dependent upon its participation in these programs.

COEI's annual report prepared by member institutions requires that an Accreditation Liaison officer be designated. Each year the Plaintiffs designated Mr. Guido Sanchez as liaison officer regarding any accreditation matter. COEI failed to communicate with Mr. Sanchez on many occa-

sions involving accreditation matters, including the July 13, 1988, and December 5, 1988, letters. Thus, all of the Plaintiffs' alleged failures to timely communicate with the Defendants, if they occurred at all, were due to the Defendants' own omissions.

The uncontroverted evidence establishes that the Schools obtain little, if any, financial advantage, from applying the NACCAS rather than the SACS refund policy. The Schools timely conformed their refund policy to the SACS refund policy, notwithstanding the amendment in December 1988 that would have allowed the Schools to use the NACCAS policy. Nor did the Plaintiffs give any misleading information to SACS regarding their accreditation status with NACCAS. All information requested by Defendants was fully disclosed by Plaintiffs. Furthermore, the Plaintiffs did everything possible to address and cure all alleged violations cited by the Defendants. The Defendants' actions often interfered with the Plaintiffs' efforts, and when the Plaintiffs tried to comply with the demands of SACS and COEI, the Defendants often capriciously failed to accept those efforts.

The Court finds that the documentation and correspondence upon which COEI relied to give the Plaintiffs notice of the charges and complaints against them fell woefully short of that required by fundamental fairness. COEI's initial and continued refusals to work with the Plaintiffs on accreditation matters were arbitrary, capricious, and evidence of either a malignant and uncaring bureaucracy, or of a decision to expel the Plaintiffs from SACS and find reasons for the expulsion later. The true reasons for the behavior of COEI and SACS may never be known, but at trial there was convincing evidence of the attitude which may have given rise to that behavior. Dr. Kenneth W. Tidwell, executive director of COEI, testified during cross examination that he felt that if SACS wanted to expel the Plaintiffs, it could do so:

Q (by Mr. Robbins): Has Wilfred Academy ever been given specific reasons for the action of the commission?

A (Tidwell): You have been told by the commission that your peers, in carrying out their positions in the commission, simply do not want you as part of the association.

. . . . .

Q: And [the commission's response] was, we drop you and now you can't do anything about it, isn't that right?

A: It may be that they [the commission] simply didn't have confidence in you [the Schools] going forward.

THE COURT: You said earlier, Doctor, which I think the crux of the matter, "does not want them as part of the association." That was your answer.

A: I think that would be what most of us in this room think.

THE COURT: I think we have now found the smoking gun.

No evidence before the Court leads to a contrary conclusion.

Nevertheless, regardless of COEI's motives for dropping the Plaintiffs' accreditation, the manner in which COEI did so was so inconsistent with fundamental fairness that the Court can not allow the Plaintiffs' harm to go unredressed.

Accreditation is a prerequisite to participation in the student financial programs discussed above. The Schools are overwhelmingly dependent on students who participate in those programs, who in turn could not attend the Schools without that aid. Thus, accreditation is a "virtual prerequisite" to the practice of the Schools' profession, and the Court's scrutiny of the Defendants' actions is justified. *See Marjorie Webster Jr. College v. Middle States Assoc.*, 432 F.2d 650, 655 (D.C.Cir.1970). "Even where less than complete exclusion from practice is involved," as may be the case for those Schools which are dually accredited, "deprivation of substantial economic or professional advantages will often be sufficient to warrant judicial action." *Id.* This is such a case.

 The decision to deny or withdraw accreditation is viewed by this Court with great deference to the expertise of the accrediting agency. *See id.* at 655, 657.

The agency's decision should be set aside only if it is arbitrary, unreasonable, or not supported by substantial evidence. *Medical Instit. v. Nat'l Assoc. of Trade & Technical Schools,* 817 F.2d 1310, 1314 (8th Cir.1987). The standards set by the accrediting agency must be reasonable and applied fairly. *Marjorie Webster Jr. Col.,* 432 F.2d at 655. Thus, it is not necessary to decide whether SACS is a federal or state agency. The common law, even in the absence of state action, imposes an obligation of fundamental fairness on accrediting agencies in actions affecting accreditation. *Medical Institute,* 817 F.2d at 1314.

An accrediting association's relationship to its member schools is a special relationship of trust and confidence. It results from the tremendous disparity of bargaining power in favor of the accrediting agency and from the fact that loss of accreditation can deprive a school of the opportunity to participate in governmental programs, such as federal financial aid. This relationship implies a duty of good faith and fair dealing, which is breached by a violation of fundamental fairness.

Finally, the United States Department of Education regulations mandate that the Defendants provide certain procedural protections to their members when decisions regarding accreditation are made. *See* 34 C.F.R. § 602.16 (1989). In the Court's view these regulations are intended to insure, at the very least, that the Defendants treat their members with fundamental fairness as a requirement for the Defendants' accreditation by the Department. The Court does not mean to imply that these regulations give the Schools a private cause of action in the event of SACS' noncompliance with the regulations. Nor has this Court taken it upon itself to adjudicate that matter. Nevertheless, the Schools must reasonably have expected SACS to live up to the regulations, and SACS has clearly violated standards of conduct similar to those laid in the regulations. SACS' decision to withdraw accreditation from the Plaintiffs was not made in accordance with fundamental fairness, was not based upon substantial evidence, and was arbitrary and capricious.

The decision was made through a procedure which violated fundamental fairness in at least three ways. First, the Plaintiffs were faced with vague and general charges and were given no notice of the factual bases of the charges. Second, on several occasions COEI and SACS failed to communicate with the Schools through the appropriate channels. When COEI and SACS did provide information—often only when the Schools initiated the contact—that information was repeatedly confusing or contradictory. When the Schools admitted their understandable confusion, they were accused of feigning innocence and of refusal to cooperate with COEI. Third, the Plaintiffs were prevented by SACS's from taking the corrective actions that SACS's demanded by the charges, and SACS incorrectly interpreted the Schools' attempts to comply with SACS' rules and suggestions as attempts to circumvent SACS' authority.

SACS' decision to withdraw Plaintiff's accreditation was not based upon substantial evidence, but upon what amounted to virtually no evidence at all. In fact, most of the "evidence" of the Schools' alleged failures is nothing more than a specter wafting from a cauldron of misunderstandings for which the Schools are not at fault, combined with the Defendants' poor administrative procedures and mixed signals to the Schools, and written and oral communications issued by SACS and COEI indicating a refusal or an inability to communicate clearly.

The refund policy issue cannot serve as a basis for dropping the Schools' accreditation. That complaint was waived by the issuance of new accreditations to the Schools and by the Defendants' long course of dealing with the Plaintiffs. Both continued despite the Defendants' knowledge of the allegedly improper refund policy. A waiver was also effected by the Defendants' own actions in changing SACS's policies to approve the Plaintiff's refund policy. The Plaintiffs could only have been, and in fact for a significant time were, led

to believe that SACS thereby ended the dispute over refund policies.

The dual accreditation issue also can not support the action because there is no evidence that Plaintiffs were in violation of SACS's policy as it was written. In addition, Plaintiffs can not be penalized for a purported violation of an interpretation of SACS's written policy on this matter when the interpretation was never communicated to Plaintiffs.

The final charge, failure to provide information, is in the words of SACS's Executive Director a "catchall charge." This charge has no independent basis in the evidence and can not support the Defendants' actions. Indeed, the Plaintiffs responded timely and fully to all requests communicated by the Defendants.

CONCLUSION

The loss of accreditation by Plaintiffs is the ultimate sanction and will cause Defendants irreparable injury through the loss of reputation and goodwill and through the destruction of a business with over seventy years of operation. No amount of deference by this Court to the special expertise of an accrediting agency can permit the Defendants to destroy Plaintiffs' business upon such defective procedure and in light of the complete absence of credible evidence of violations. The Defendants' actions, taken in violation of their obligation of fair dealing, and the resultant irreparable injury caused to the Plaintiffs authorize this Court to grant appropriate equitable relief. The Plaintiffs shall file a proposed Judgement within ten days, and the Defendants shall respond within ten days thereafter.

Finally, Plaintiffs are entitled to recover reasonable attorneys' fees from Defendants pursuant to Tex.Rev.Civ.Prac. and Rem.Code § 38.001.